UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:06CR14HEA(MLM) |
| | ) | |
| BRANDON TRIGG, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the court on the Pretrial Motions filed by defendant. [Docs. 14 and 15] The government responded to the Motions. [Doc. 16, 17, 18, 19][1]

**1.     Motion of Defendant to Dismiss Indictment [Doc. 15]**

Defendant moved to dismiss the indictment on grounds that the Grand Jury did not have adequate evidence to return an indictment; that the indictment is based on heresay and not on sufficient competent evidence; and that the indictment charges defendant under laws which are illegal, void and unconstitutional as applied to defendant.

To be legally sufficient on its face, the indictment must contain all the essential elements of the offenses charged, it must fairly inform the defendant of the charges against which the defendant must defend, and it must allege sufficient information to allow the defendant to plead a conviction or an acquittal as a bar to a subsequent prosecution. United States Const. Amends. V and VI; Fed.R.Crim.P. 7(c); Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. Just, 74 F.3d 902, 903-04 (8th Cir. 1996); United States v. Wessels, 12 F.3d 746, 750 (8th Cir. 1993), cert. denied, 513 U.S. 831, (1994); United States v. Young, 618 F.2d 1281, 1286 (8th Cir.), cert. denied, 449 U.S. 844 (1980).

---

[1] Because of some glitch in the CM/ECF filings, the government responded twice to each of defendant's Motions. The Responses to the Motion to Dismiss Indictment are Docs. 17 and 19. The Responses to the Motion to Suppress Statements and Evidence are Docs. 16 and 18.

Defendant is charged in two Counts. Count I charges him with being a Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1). Count II charges him with being a Felon in Possession of Ammunition also in violation of 18 U.S.C. § 922(g)(1).

As an initial matter, the Eighth Circuit has repeatedly rejected challenges to the constitutionality of § 922(g)(1). See United States v. Gary, 341 F.3d 829, 835 (8th Cir. 2003) cert. denied, 540 U.S. 1139 (2004) (holding that it [the Eighth Circuit] has repeatedly rejected challenges to the constitutionality of § 922(g)(1)). In light of such case law, defendant's challenge is without merit.

In addition, the defendant alleges that the indictment was returned on the basis of insufficient and/or incompetent evidence. An indictment valid on its face is immune from attack by a claim that there was insufficient competent evidence presented to the grand jury. United States v. Calandra, 414 U.S. 338, 349-52 (1974); Costello v. United States, 350 U.S. 359, 363-64 (1956).

An indictment may be based in whole or in part on hearsay evidence, Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395 (1959); United States v. Hintzman, 806 F.2d 840, 843 (8th Cir. 1986) (holding Constitution does not prohibit use of heresay testimony in grand jury proceedings and even an indictment based exclusively on heresay may be valid); United States v. Bednar, 728 F.2d 1043, 1049 (8th Cir.) (same), cert. denied, 469 U.S. 827 (1984); United States v. Neff, 525 F.2d 361, 363 (8th Cir. 1975) (holding indictment may be based entirely on heresay). Even if illegally seized evidence was presented to the grand jury, the indictment would not be rendered invalid by such evidence. United States v. Calandra, 414 U.S. 338, 354 (presentation of inadmissible evidence to grand jury involves no independent or new violation of the Fourth Amendment); United States v. Levine, 700 F.2d 1176, 1179 (8th Cir. 1983) (the exclusionary rule does not prohibit illegally seized evidence from being considered by a grand jury).

This indictment is a plain, concise and definite statement of the essential facts constituting the offenses charged and complies in all respects with Rule 7 of the Federal Rules of Criminal Procedure. It tracks the language of the statute and places the defendant on notice of the nature and

extent of the charges in order to protect him from double jeopardy. See Hamling, 418 U.S. at 117; Young, 618 F.2d at 1286.

**2.      Defendant's Motion to Suppress Statements and Evidence [Doc. 14]**

An Evidentiary Hearing was held on 2/14/06.[2] At the hearing the government the government presented the testimony of Detective Wendel Ishmon and Police Office Joseph Lankford, both of the St. Louis Metropolitan Police Department. Defendant presented the testimony of Valerie Gavin. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of facts and conclusions of law.

## FINDINGS OF FACT

**1.      Events at 3630 Phillips**

Detective Ishmon, who has been with the St. Louis Metropolitan Police Department for nine years, is responsible for investigating state and federal drug violations. He testified that in connection with his duties he obtained a Search Warrant for the residence at 3630 Phillips, Apartment B. He prepared an Application for the Search Warrant and an Affidavit in Support. Gov.Ex.1. The Application describes the apartment building with particularity and describes the objects of the search believed to have been used as a means for committing a felony, Violation of the Missouri Controlled Substance Law, as: "Cocaine Base (Crack Cocaine), Powder Cocaine, Marijuana, U.S. Currency, Drug Transaction Records, Weapons and any other instruments used of [sic] the crime and the physical person of the target known as Lonnie Davis."

The Affidavit in Support states that during the week of October 17, 2005 Det. Ishmon was contacted by a proven reliable Confidential Informant ("CI") that he had worked with for the past

---

[2]      Because counsel was taken by surprise at defendant's insistence upon testifying, the hearing was continued over the government's objection until 3/1/06 to give counsel and defendant an opportunity to further discuss defendant's options and best interest with regard to testifying. On 3/1/06 after record made in open court, no further testimony or evidence was adduced.

year. During that time, the CI had supplied intelligence and information that had been proved reliable and had led to four arrests with narcotics being seized. All four cases were pending in the City of St. Louis Circuit Attorney's Office at the time of the application.

The CI told Det. Ishmon that Lonnie Davis, a black male, 50-52 years of age, medium complexion, approximately 5'7" to 5'8" tall weighing approximately 200 pounds and residing at 3630 Phillips, Apt. B, sells marijuana and cocaine from the apartment. The CI advised that he/she had observed Davis remove narcotics from his person and sell to various people. The CI said Davis stores narcotics and U.S. currency obtained from the sale of narcotics in his apartment and inside the detached garage.

The CI said Davis sells narcotics in the following manner: a perspective purchaser knocks on the front door, Davis admits the prospective purchaser and after the narcotics transaction, the purchaser exits the apartment and departs the area.

Det. Ishmon and Det. Leo Liston conducted surveillance in their covert vehicle on 10/20/05. During this time they observed several people knock on the front door, be permitted to enter the apartment, and after a short period of time, exit the apartment and depart the area. On 10/24 and 10/25/2005 Dets. Ishmon and Liston again conducted surveillance in the covert vehicle and observed persons knock on the front door of 3630 Phillips, Apt. B, and be permitted into the apartment by a black male who fit the physical description of Davis. Shortly after, the people would leave and depart the area. Based on Det Ishmon's experience he testified that these short term visits were consistent with drug trafficking at a known drug house.

The CI told Det. Ishmon that he had been inside the apartment within the 18 hours preceding the Application and observed a large amount of marijuana and cocaine inside the apartment.

Det. Ishmon presented the Application and Affidavit in Support to Judge Evelyn Baker in the Circuit Court of the City of St. Louis. Based on the information contained therein, Judge Baker signed the Search Warrant on 10/25/05 at 2:10 p.m. Gov.Ex.1

After obtaining the Search Warrant, Det. Ishmon conducted surveillance again to learn if the target was at the residence and to try to obtain information about how many individuals were present in the residence for the purpose of determining the type of entry which would be necessary for officer safety.

As he surveilled, he saw defendant, Brandon Trigg, approach on a bicycle. Det. Ishmon observed defendant to be paying attention to his right waistband area, as if he was concealing something there. Based on his experience, Det. Ishmon believed it might be a weapon. Defendant entered the residence.

Det. Menendez told Det. Ishmon he saw three subjects exit the rear of the building. Det. Ishmon drove to the south alley where he saw three subjects standing next to two cars. They were a black male (Charles Upshaw), an Hispanic male (Jose Hernandez), and an Hispanic female. The two males carried bags from one of the cars into the residence. When they returned they were not carrying anything. Det. Ishmon informed the other officers that they should approach the subjects to attempt to learn if Lonnie Davis was in the building.

The door to the residence was open. The officers knocked and announced their presence and the fact that they had a Search Warrant and received no response. They knocked and announced again, received no response and then entered. Dets. Ishmon, Menendez and Liston entered together.

They observed in the living room Lonnie Davis and another subject, later identified as William Hackworth. These two subjects were handcuffed for officer safety. Det. Menendez went through the dining room to the west bedroom to clear the area for officer safety. His gun was drawn and he announced "police officer/search warrant" as he proceeded. As he approached the west bedroom he saw defendant standing at the closet with his back towards the officer. Det. Menendez heard something "thunk" on the floor. Defendant turned around, faced Det. Menendez, placed his hands up and walked towards him. Det. Menendez handcuffed defendant for safety. Defendant was not under arrest. Det. Ishmon, who had followed Det. Menendez, took defendant to the living room

area and left him with Det. Liston who was with the other two subjects in the living room. Det. Ishmon went back to the west bedroom where he saw a .380 hand gun on the floor by the closet, right where defendant had been standing. He removed three live rounds.

Det. Ishmon returned to the living room and took defendant into the dining room and informed him of his Miranda Rights by reading from his Rights card.

The St. Louis Metropolitan Police Department Card states the following:

Warnings – Constitutional Rights

1. You have the right to remain silent.
2. Anything you say can and will be used against you in court.
3. You have the right to a lawyer and to have him with you while you are being questioned.
4. If you cannot afford to hire a lawyer, one will be appointed for you before any questioning if you so desire.

Before being asked any questions, defendant said "That gun ain't mine. I got a conviction. I don't even live here." At that point, defendant did not know the .380 firearm had been seized. Defendant was placed under arrest, re-advised of his rights and was taken back to the living room and later placed in the police cruiser.

A large plastic bag with fourteen bundles of marijuana was found in Lonnie Davis' bedroom. In addition, the officers located in Lonnie Davis' bedroom a loaded .45 caliber handgun and mail and clothing indicating Lonnie Davis' residence in the apartment. Lonnie Davis was arrested for trafficking in drugs and for a weapons offense. He was advised of his Miranda Rights and stated the weed was his and the others in the house did not know anything about it. He said he was keeping the gun in his room for a friend. He did not mention the .380 caliber gun.

Lonnie Davis told Det. Ishmon there was more marijuana in the garage. Det. Ishmon obtained the key from Lonnie Davis' pocket and located a large tub with seven more bundles of marijuana, two large digital scales, plastic bags, blue plastic wrap similar to that located in the house, a gun holster and a box of fabric softener.

Det. Ishmon spoke to all three people who were outside the house. Charles Upshaw was advised of his Miranda Rights and was asked about the cars. He said he did not own the cars. During a search, two keys to the Chevy Lumina were located. This car had a hidden compartment in the rear bumper area where they had obtained the bags they carried into the house. Jose Hernandez was advised of his Miranda Rights and asked about the cars. He said he owned the Buick LeSabre but said he had no knowledge of the other car. Jose Hernandez' wife, Benitez, said they were on their way to Indianapolis and had to come to the apartment to bring Upshaw's son some clothes. In addition, William Hackworth, who had been inside the residence, said he was just visiting and had no knowledge of guns or drugs.

Det. Ishmon testified that to the best of his knowledge the apartment was Lonnie Davis' residence.[3] The Return in the Inventory specifies all the items seized including the .380 caliber semi-automatic pistol and the three live rounds. Gov.Ex.1

**2.      Events at 328 Hill**

P.O. Joseph Lankford has been with the St. Louis Metropolitan Police Department for approximately two and a half years. He testified that he obtained a Search Warrant for the residence at 328 Hill. He prepared an Application and Affidavit in Support. Gov.Ex.2. The Application describes the residence with particularity and describes the objects of the search believed to have been used to commit a felony, Violation of the Missouri Controlled Substance Law, as: "crack-cocaine (a schedule #2 controlled substance), currency, records, firearms, and related paraphernalia."

The Affidavit in Support says that on 11/28/05 P.O. Lankford was contacted by a tipster and advised that crack cocaine and illegal weapons were being stored inside 328 Hill. He/she identified

---

[3] On cross-examination Det. Ishmon was asked about a written statement made by Lonnie Davis at the police station. It was referred to as Gov.Ex.3 but was not admitted into evidence. In this statement, Lonnie Davis does not refer to the caliber of the gun or to the bedroom. Lonnie Davis was charged but warrants were refused.

an individual known only to him/her as "T", described as a black male approximately 25 years old, 5'10", 180 pounds. The tipster stated that "T" sells his crack cocaine at the indicated address on Hill.

The tipster stated that "T" sells his crack cocaine in the following manner: The front entrance to 328 Hill is located on the north side of the building facing Hill Street. Customers approach the residence through the front door which is almost always locked. Customers knock on the front door, gain admittance and wait in the front living room. "T" retrieves the crack cocaine from several places throughout the residence and upon his person, including between his legs. In particular, "T" was seen taking crack cocaine from inside a large speaker that is located in the front living room. The tipster said that "T" is known to be armed and has seen a black semi-automatic handgun lying on the coffee table in the open. After the transactions are completed, customers quickly leave.

PO Lankford considered the tipster reliable because he/she had provided PO Lankford information which had led to the arrest of six persons for possession of illegal drugs with warrants issued.

Computer inquiries of 328 Hill revealed several calls for service were made at that address. The most recent call was for a domestic assault second degree which was cleared by arrest as reflected under Complaint No. 05-92859. The tipster described "T" as a black male, medium/light complexion, middle twenties, 5'9" to 5'11", 210-220 pounds, bald or very low haircut. Between the dates of 11/28/05 and 12/1/05 PO Lankford conducted surveillance of 328 Hill. He observed numerous subjects enter the residence and leave after short stays. He observed several subjects approach the residence by crossing the soccer field that is located just to the north of the residence.

On 12/5/05 PO Lankford conducted surveillance of 328 Hill and again observed several short term visitors. On 12/6/05 he was contacted by the tipster who advised that he/she had been inside 328 Hill within the last 24 hours and observed "T" to be in possession of a quantity of crack cocaine with a black semi-automatic handgun sitting on the coffee table in the front room.

PO Lankford presented the Application and Affidavit in Support to a judge in the Circuit Court of the City of St. Louis.[4] Based on the information contained therein, the judge signed the Search Warrant on 12/7/05 at 3:20 p.m. At no time did PO Lankford check the lease to the residence at 328 Hill.

The search team was comprised of officers from the Mobile Reserve Unit, District Officers and PO Lankford. On 12/9/05 they approached the residence through the gangway. Mobile Reserve Officers knocked and announced "Police Officers/Search Warrant" and received no answer. After less than one minute but at least thirty seconds, they breached the front door. Defendant was sitting in the living room facing the door. His girl friend was in the east rear bedroom and there was a child in the west rear bedroom. Defendant was handcuffed and remained seated in the living room. The officers searched the residence and found a piece of crack cocaine wrapped in plastic in a speaker in the living room, a box of .45 ammunition on a ledge in the living room near where defendant was sitting, and an ammunition box in the east bedroom on a shelf in the closet. The clothing in the closet was both men's and women's clothing. Under the bed they located a white plate with white residue, razor blades, a digital scale and plastic baggies with corners cut. They also found a receipt for the purchase of a .45 caliber handgun and a Southwestern Bell phone bill in defendant's name. While the officers searched, defendant repeatedly said "Is that all you found?" He asked the officers to open the door because he said he was hot. However, he had on a sleeveless white t-shirt and light pants.

The officers arrested defendant for illegal narcotics and advised him of his Miranda Rights by reading from the St. Louis Metropolitan Police Department card:

The St. Louis Metropolitan Police Department Card states the following:

Warnings – Constitutional Rights

1. You have the right to remain silent.

---

[4] The judge's name is illegible and PO Lankford did not state the name during his testimony.

      2.        Anything you say can and will be used against you in court.
3. You have the right to a lawyer and to have him with you while you are being questioned.
4. If you cannot afford to hire a lawyer, one will be appointed for you before any questioning if you so desire.

Defendant acknowledged he understood his rights. Defendant said "I ain't got no gun" and "That shit ain't mine" referring to the crack cocaine. Regarding the crack in the speaker, defendant said "I don't know how it got there, I don't know what this is about. This is all bullshit." PO Lankford asked him about the ammunition and he said "Is it illegal to have bullets?" He said over and over again "I ain't got no gun." This was not in response to questioning. He was searched incident to his arrest and $580 was located in his pants pocket. See the Return and Inventory for a list of the items seized. Gov.Ex.2

Valerie Gavin testified that on 12/9/05 the lease to the apartment at 328 Hill was in her name. She said she had lived there with her daughter since September, 2005. Prior to that she lived down the street at 324 Hill Street "with someone" and that that residence was not in her name. She testified the defendant did not live at 328 Hill Street with her; she later clarified that defendant lives there sometimes and sometimes with another friend. The phone bill was in defendant's name because she "had recent bills in her name." She said her sister used her name and ran up her phone bill.

On 12/9/05 when the police came, both she and defendant were asleep. She woke up with a police officer in the room with a gun in her face. She put her hands up as she was told and they put "wires" on her arms and took her into the living room. Defendant was by her side. The officers began to search. They located her gun permit and a receipt for a .45 handgun. She told the officers she bought it for protection. She told the officers the gun was not in the home. The officer showed her the bullets they found on the top shelf of the closet. She told them "Its all mine" when they found the ammunition. She said the clothing in the closet was all hers.

She said she purchased the gun and ammunition in August, 2005 with her cousin Tony Griffin. She did not know his address because he is "between girl friends." She testified she had

never fired the gun, she had only loaded it and she did not know which side the safety was on. She said she did not see the officers take photographs or take the speaker apart. The only thing she heard defendant say was "Can I put my clothes on?" She testified the officers also brought dogs to search the house. She was not arrested.

She was not pleased; she said they tore up her house, her daughter was terrified and they used profanity in front of her daughter. She and defendant went to the Internal Affairs Division and reported Officer Lankford. She testified he was unprofessional and very upset that he did not find anything except one rock of crack cocaine.

Valerie Gavin further testified that she knows Lonnie Davis because when she moved from 324 Hill to 328 Hill, she stayed at Lonnie's and left some of her things there. She was going through a very bad divorce and she had been threatened by her ex-husband. She also testified that her ex-husband sometimes used her bedroom and that therefore, not everything in the bedroom belonged either to her or to defendant.

She said the box spring to her bed is on the floor so the 14 plastic baggies could not have been under the bed. She said the white plate with razor blades found in the bedroom were hers as was the digital scale she was holding for her ex-husband. Her ex-husband died on 2/2/06 because he "swallowed something."

The court acknowledges the discrepancies in the officer's and Ms. Gavin's versions of the events but finds that while these discrepancies may be significant as to the guilt or innocence of the defendant, they do not impact suppression issues.

### CONCLUSIONS OF LAW

1.   **Events at 3630 Phillips**

As an initial matter, defendant does not have standing to challenge the search at 3630 Phillips.[5] A defendant has standing to challenge the admissibility of evidence only if his own constitutional rights have been violated. United States v. Padilla, 508 U.S. 77, 81 (1993); United States v. Salvucci, 448 U.S. 83, 86-87 (1980); Rakas v. Illinois, 439 U.S. 128, 134 (1978). In cases involving Fourth Amendment violations, courts determine standing by determining whether defendant had a reasonable expectation of privacy in the area searched or the items seized. The Supreme Court has adopted a two-part test to determine whether a person's expectation of privacy is legitimate: First, the person must exhibit an actual subjective expectation of privacy, and second, society must be prepared to recognize that expectation as objectively reasonable. Katz v. United States, 389 U.S. 347, 361 (1967).

The defendant has the burden of proof on the issue of his reasonable expectation of privacy. United States v. Kiser, 948 F.2d 418, 423 (8th Cir. 1991), cert. denied, 112 S.Ct. 1666 (1992). If a defendant cannot prove a sufficiently close connection to the object or place searched, he has no standing to claim the search was illegal. United States v. Sanchez, 943 F.2d 110, 113 (1st Cir. 1991). The Eighth Circuit in Gomez, 16 F.3d at 256, has cited with approval a seven-part test for determining standing:

> Ownership, possession and/or control of the area searched or items seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or non-existence of a subjective expectation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case. Sanchez, 943 F.2d at 113.

In the present case there is absolutely no connection between defendant and 3630 Phillips except that he happened to be there at the time of the search. The evidence shows it was Lonnie Davis' residence, Lonnie Davis was the subject of the search, he was the one targeted by the CI,

---

[5] As pointed out in United States v. Sanchez, 943 F.2d 110, 113 n.1 (1st Cir. 1991), the use of the word "standing" is convenient but somewhat imprecise. The Supreme Court has indicated in Rakas v. Illinois, 439 U.S. 128 (1978), that matters of standing in the context of searches and seizures actually involve substantive Fourth Amendment law. Standing is not to be analyzed apart from the merits, rather a defendant is required to prove a legitimate expectation of privacy as a prerequisite to challenge unlawful police conduct. Sanchez, 943 F.2d at 113 n.1.

Lonnie Davis' mail was seized from the residence and defendant even said he did not live there. The .380 firearm will be dealt with below, however as far as the search is concerned, there is no evidence defendant owned or possessed the property, historically used it or had ability to regulate access to the property. See Sanchez, 943 F. 2d at 113. There are no circumstances here that would make it objectively reasonable for defendant to argue a subjective expectation of privacy. Id. Therefore, defendant lacks standing to challenge the probable cause for the search, the execution of the Warrant and the items seized in the residence, except perhaps for the .380 firearm.

As for the .380 firearm with which defendant is charged, Det. Ishmon described seeing defendant arrive on a bicycle paying attention to his right waistband as if he was concealing something which Det. Ishmon believed might be a weapon. When Det. Menendez went to the west bedroom in which defendant was standing, he heard something hit the floor in the location where defendant was located. After defendant was cuffed and taken to the living room, Det. Ishmon went to the bedroom and saw on the floor a .380 firearm where defendant had been standing.

When police officers are lawfully in a particular location and observe items in plain view which they have probable cause to believe are contraband or evidence of a crime, they may seize such items without a warrant. Coolidge v. New Hampshire, 403 U.S. 443, 464-73 (1971); Arizona v. Hicks, 480 U.S. 321, 326 (1987); United States v. Garner, 907 F.2d 60, 62 (8th Cir. 1990), cert. denied, 498 U.S. 1068 (1991). There is no requirement that the discovery be inadvertent. Horton v. California, 496 U.S. 128, 136-143, 110 S.Ct. 2301, 2308-11 (1990). Here, Det. Ishmon was lawfully in the residence executing the Search Warrant. Therefore, the .380 firearm which was in plain view should not be suppressed.

In addition, it can be argued that defendant abandoned the gun by dropping it. Warrantless searches and seizures of abandoned property do not violate the Fourth Amendment. United States v. Segars, 31 F.3d 655, 658 (8th Cir. 1994). Whether a person intends to abandon property may be inferred from words spoken, acts done and other objective facts, and all relevant circumstances at the time of alleged abandonment should be considered. United States v. Hoey, 983 F.2d 890, 892

(8th Cir. 1993). The issue is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished a reasonable expectation of privacy so that a search and seizure is valid. Id. Abel v. United States, 362 U.S. 217, 241 (1960); United States v. Ruiz, 935 F.2d 982, 984-85 (8th Cir. 1991). In the present case defendant arguably dropped the gun in order that it not be found on his person. He clearly wanted to distance himself as much as possible from the firearm. It should not be suppressed on the alternative ground of abandonment.

As for defendant's statements, after Det. Ishmon found the gun, he took defendant from the living room to the dining room and even though defendant was not under arrest, Det. Ishmon advised him of his Miranda Rights as fully set out above. Defendant was not in custody but was merely being detained at that time. The reading of Miranda rights is required only "whenever a suspect is (1) interrogated (2) while in custody." United States v. Cordova, 990 F.2d 1035, 1037 (8th Cir.), cert. denied, 510 U.S. 870 (1993), quoting United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (footnote omitted). "[E]ither express questioning or its functional equivalent" may constitute "interrogation." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Without knowing that the gun had been seized and apparently not in response to any questioning, defendant said "That gun ain't mine. I got a conviction. I don't even live here." "The Supreme court in Miranda expressly stated that '[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admission is not affected by our holding today.'" United States v. Butzin, 886 F.2d 1016, 1018 (8th Cir. 1989) quoting Miranda v. Arizona, 384 U.S. 436, 478 (1966). However, whether the statements were spontaneous or not, defendant had been fully advised of his Miranda Rights and waived them by making a statement. See, infra.

After defendant made his spontaneous statement, he was placed under arrest, re-advised of his Rights and taken back to the living room. Any statements he made thereafter were made after being fully advised of his Miranda Rights. A defendant may knowingly and intelligently waive his rights and agree to answer questions. Miranda v. Arizona, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has

the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver of the Miranda rights by the defendant. Colorado v. Connelly, 479 U.S. 157 (1986). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry" Dickerson v. United States, 530 U.S. 428, 444 (2000). The court must look to the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception; and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412 (1986).

The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Haynes v. Washington, 373 U.S. 503 (1963); Colorado v. Connelly, 479 U.S. at 170. However, as the Supreme Court stated in Berkemer v. McCarthy, 468 U.S. 420 (1984), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare." Id. at 433 n. 20; Dickerson, 530 U.S. at 444. This is not one of the rare cases described by Berkemer. Defendant's statements should not be suppressed.

**2.    Events at 328 Hill**

It is reasonable to assume for purposes of this Motion that defendant had an expectation of privacy in Valerie Gavin's residence at 328 Hill. Valerie Gavin said defendant lived at her house and with another friend, "back and forth," and admitted the phone bill was in defendant's name. The subject of the search was "T," arguably for defendant's last name, Trigg; therefore, for purposes of this motion, the court finds that defendant has standing to challenge the search.

Search warrants to be valid must be based on a finding by a neutral detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband or a person for whose arrest there is probable cause may be found in the place to be

searched. Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967); Fed.R.Crim.P. 41. The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Probable cause is "a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232. Applications and affidavits should be read with common sense and not in a grudging, hypertechnical fashion. United States v. Ventresca, 380 U.S. 102, 109 (1965). Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented. Gates, 462 U.S. at 230. The duty of the reviewing judge "is simply to ensure that the [issuing judge] had a `substantial basis for . . . conclud[ing]' that probable cause existed." Gates, 462 U.S. at 238-39, quoting Jones v. United States, 362 U.S. 257, 271 (1960). Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference. Gates, 462 U.S. at 236. The affidavit presented in the instant case clearly contains the "fair probability" that evidence, instrumentalities or fruits of a crime or contraband would be found at 328 Hill. The facts set out above show that there was a substantial basis for concluding that probable cause existed.

The officers knocked and announced their presence. 18 U.S.C. § 3109 provides in part that an officer may break into a house to execute a search warrant "if, after notice of his authority and purpose, he is refused admittance." The defendant bears the burden of establishing a prima facie case when asserting a § 3109 claim. United States v. Schenk, 983 F.2d 876, 878 (8th Cir. 1993) (quoting United States v. Mueller, 902 F.2d 336, 344 (5th Cir. 1990) (citation omitted)); United States v. DiCesare, 765 F.2d 890, 896 (9th Cir. 1985). There is no hard-and-fast time limit that the officers must wait after announcing their presence and purpose before entering the residence. Schenk, 983 F.2d at 879; United States v. Streeter, 907 F.2d 781, 789 (8th Cir. 1990), overruled on other grounds, United States v. Wise, 976 F.2d 393, 401 (8th Cir. 1992) (en banc). However, a "failure to answer a knock and announcement has long been equated with a refusal to admit the

search party and a justification for forcible entry." United States v. Ramos, 923 F.2d 1346, 1356 (9th Cir. 1991), quoted with approval in Schenk, 983 F.2d at 879.

Here, the officers waited less than one minute but more than thirty seconds before entering. It is true that a very brief time cannot be equated with a refusal of admittance. See, e.g., United States v. Marts, 986 F.2d 1216, 1217 (8th Cir. 1993) (refusal cannot be inferred *merely* from the lapse of less than five seconds). However, twenty and twenty-five to sixty seconds have been found to be permissible to raise the inference of refusal of admittance. United States v. Lucht, 18 F.3d 541, 549 (8th Cir.), cert. denied, 513 U.S. 949 (1994). See United States v. Banks, 540 U.S. 31, 38 (2003) (holding police officers executing a search warrant do not have to wait longer than 15 to 20 seconds after they knock and announce; the test is the totality of circumstances; and the crucial factor is how long it would take for someone to retrieve drugs and go to the commode or kitchen sink to dispose of them). The execution of the Warrant was lawful.

When the officers entered the residence they detained defendant and Ms. Gavin in the living room. After the search they arrested defendant for the crack cocaine in the speaker (a violation of state law) and he was advised of his Miranda Rights as fully set out above. As to the narcotics, he made an exculpatory statement. When questioned about the ammunition, he merely asked if it was illegal to have bullets. He repeated over and over that he did not have a gun and asked "Is that all you found." These comments were spontaneous and not in response to questioning. The law regarding Mirandized statements and spontaneous statements is set out above and applies here. Defendant's statements should not be suppressed.

Defendant was searched incident to his arrest and $580 was recovered from his pants pocket. The search of defendant's person was lawful because it was incident to his lawful arrest. Chimel v. California, 395 U.S. 752, 763 (1969); United States v. Robinson, 414 U.S. 218, 235 (1973); New York v. Belton, 453 U.S. 454 (1981). Therefore, the U.S. currency found on defendant's person should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Dismiss Indictment be **DENIED**. [Doc. 15]

**IT IS FURTHER RECOMMENDED** that defendant's Motion to Suppress Statements and Evidence be **DENIED**. [Doc. 14]

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
**MARY ANN L. MEDLER**
**UNITED STATES MAGISTRATE JUDGE**

Dated this  10th  day of March, 2006.